UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

**JUDITH MAYSONET** and **ANTHONY McFARLANE**,
as Parents and Natural Guardians of **A.M.**, and
**JUDITH MAYSONET** and **ANTHONY McFARLANE**,
Individually,

<table>
<tr><td style="text-align:center">Plaintiffs,</td><td style="text-align:right"><b>22-cv-01685 (LGS)</b></td></tr>
<tr><td></td><td></td></tr>
<tr><td style="text-align:center">-against-</td><td style="text-align:right"><b>ORAL ARGUMENT</b><br><b>REQUESTED</b></td></tr>
</table>

**NEW YORK CITY
DEPARTMENT OF EDUCATION,**

Defendants.

------------------------------------------------------------------------X

# PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,
Brain Injury Rights Group, Ltd.
*Attorneys for the Plaintiffs*


By: _____**/S/**_____
Rory J. Bellantoni (RB 2901)
300 East 95th Street, Suite 130
New York, New York 10128
(646) 850-5035

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES…..………………………………………………………….i

PRELIMINARY STATEMENT…………………………………………………………..1

STATEMENT OF FACTS………………………………………………………………..1

LEGAL STANDARD……………………………………………………………………4

IDEA'S LEGAL FRAMEWORK...………………………………………………………5

ARGUMENT…………………………………………………………………………...7

POINT I
DOE DID NOT OFFER A.M. A FAPE AND, AND PLAINTIFFS' CHOICE OF
UNILATERAL PLACEMENT WAS APPROPRIATE………………………………..7

POINT II
SRO ERRED IN FINDING THAT EQUITABLE CONSIDERATIONS DID NOT
SUPPORT FULL RELIEF TO PLAINTIFFS……………………………………………8

    A.  The IHO Improperly Held that the Initial Lack of Vision
       Services at iBrain Warranted a Reduction of Relief…………………………......8

    B.  The SRO Improperly Held that a Reduction of Relief was
       Supported by Lack of Parent Participation……………………………………9

    C.  The SRO's Decision to Reduce Plaintiff's Relief as Part of its Prong III
       Analysis was Erroneous and Otherwise Not Entitled to Deference………….13

POINT III
DIRECT RETROSPECTIVE TUITION IS AVAILABLE UNDER THE IDEA,
AND SRO IMPROPERLY DENIED PLAINTIFFS SUCH RELIEF...…………………15

    A. IDEA Grants Courts Broad Remedial Authority to Accomplish
       Legislative Policy……………………………….…………………….....16

    B.  Various Federal Courts Have Fashioned Tailor-Made Remedies in
       IDEA Cases……………………………………………………………20

# TABLE OF CONTENTS (con't)

**Page(s)**

C. Amendments to the IDEA Support Plaintiffs' Position………….……….......22

D. The Court's Inherent Equitable Powers to Fashion a Remedy……….................25

CONCLUSION……………………………………………………………………...28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.R. ex rel. F.P. v. New York City Dept. of Educ.*
  12 CIV. 4493 PAC, 2013 WL 5312537 (S.D.N.Y. Sept. 23, 2013) ...............................................14

*Anchorage Sch. Dist. v. M.P.*,
  689 F.3d 1047 (9th Cir. 2012) ....................................................................................................10

*Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.*,
  281 F. Supp. 2d 710 (S.D.N.Y. 2003).........................................................................................5

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*,
  458 U.S. 176, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982) ........................................................5, 14

*Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*,
  990 F.3d 152 (2d Cir. 2021)........................................................................................................4

*Bettinger v. New York City Bd. of Educ.*,
  2007 WL 4208560 (S.D.N.Y. Nov. 20, 2007) ............................................................................12

*Branch v. Smith*,
  538 U.S. 254, 123 S. Ct. 1429, 155 L. Ed. 2d 407 (2003)..........................................................24

*C.L. v. Scarsdale Union Free Sch. Dist.*,
  744 F.3d 826 (2d Cir. 2014)......................................................................................................7, 9

*Cabell v. Markham*,
  148 F.2d 737 (2d Cir.)................................................................................................................17

*Carmel Cent. Sch. Dist. v. V.P. ex rel. G.P.*,
  373 F. Supp. 2d 402 (S.D.N.Y. 2005)........................................................................................12

*Cerra v. Pawling Cent. Sch. Dist.*,
  427 F.3d 186 (2d Cir. 2005).......................................................................................................5

*Connors v. Mills*,
  34 F. Supp. 2d 795 ......................................................................................................................27

*Doug C. v. Hawaii Dep't of Educ.*,
  720 F.3d 1038 (9th Cir. 2013) .........................................................................................10, 11, 12

*Draper v. Atlanta Indep. Sch. Sys.*,
  518 F.3d 1275 (11th Cir. 2008) ......................................................................................20, 21, 22

## TABLE OF AUTHORITIES (con't)

**Page(s)**

**Cases**

*E. Z.-L. ex rel. R.L. v. New York City Dep't of Educ.*,
    763 F. Supp. 2d 584 (S.D.N.Y. 2011)....................................................................6, 10

*E.M. v. New York City Dep't of Educ.*,
    758 F.3d 442 (2d Cir. 2014)....................................................................................16

*Exch. Comm'n v. C. M. Joiner Leasing Corp.*,
    320 U.S. 344, 64 S. Ct. 120, 88 L. Ed. 88 (1943).........................................................17

*F.O. v. New York City Dep't of Educ.*,
    976 F. Supp. 2d 499 (S.D.N.Y. 2013)............................................................................6

*Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*,
    510 U.S. 7, 114 S. Ct. 361 (1993)......................................................................6, 8, 16, 22

*Forest Grove School Dist.*,
    557 U.S. 230 ..............................................................................................22, 23, 24, 25

*Frank G. v. Bd. of Educ. of Hyde Park*,
    459 F.3d 356 (2d Cir. 2006)................................................................................. Passim

*Gagliardo v. Arlington Cent. Sch. Dist.*,
    489 F.3d 105 (2d Cir. 2007)......................................................................................7, 8, 9, 16

*J.S. v. Scarsdale Union Free Sch. Dist.*,
    826 F. Supp. 2d 635 (S.D.N.Y. 2011)............................................................................14

*Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ.*,
    550 F. Supp. 2d 420 (S.D.N.Y. 2008)..........................................................................5, 7, 12, 16

*Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*,
    397 F.3d 77 (2d Cir. 2005)........................................................................................4, 5

*M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*,
    226 F.3d 60 ..............................................................................................................17

*M.H. v. New York City Dep't of Educ.*,
    685 F.3d 217 (2d Cir. 2012)........................................................................................4

*M.O. v. New York City Dep't of Educ.*,
    793 F.3d 236 (2d Cir. 2015)........................................................................................6

# TABLE OF AUTHORITIES (con't)

**Page(s)**

**Cases**

*M.W. ex rel. S.W. v. New York City Dep't of Educ.*,
869 F. Supp. 2d 320 (E.D.N.Y. 2012) ...................................................................25

*Mr. "M" ex rel "K.M." v. Ridgefield Bd. of Educ.*,
2007 WL 987483 (D. Conn. Mar. 30, 2007) ..........................................................10

*Mr. and Mrs. A. ex rel. D.A.*,
769 F. Supp. 2d ................................................................................................ Passim

*Mrs. B. v. Milford Bd. of Educ.*,
103 F.3d 1114 (2d Cir. 1997).............................................................................7, 14

*Muller on Behalf of Muller v. Comm. on Special Educ. of E. Islip Union Free Sch. Dist.*,
145 F.3d 95 (2d Cir. 1998)........................................................................................7

*N.R. ex rel. T.R. v. Dep't of Educ. of City Sch. Dist. of City of New York*,
2009 WL 874061 (S.D.N.Y. Mar. 31, 2009) ......................................................7, 28

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644, 127 S. Ct. 2518, 168 L. Ed. 2d 467 (2007)......................................24

*P.K. ex rel. S.K. v. New York City Dep't of Educ. (Region 4*,
819 F. Supp. 2d 90 (E.D.N.Y. 2011) ......................................................................21

*Posadas v. Nat'l City Bank of New York*,
296 U.S. 497, 56 S. Ct. 349, 80 L. Ed. 351 (1936)................................................25

*Pub. Citizen v. U.S. Dep't of Just.*,
491 U.S. 440, 109 S. Ct. 2558, 105 L. Ed. 2d 377 (1989)......................................17

*R.B. v. New York City Dep't of Educ.*,
713 F. Supp. 2d 235 (S.D.N.Y. 2010).....................................................................12

*R.E. v. New York City Dep't of Educ.*,
694 F.3d 167 (2d Cir. 2012)................................................................................6, 14

*Reid ex rel. Reid v. D.C.*,
401 F.3d 516 (D.C. Cir. 2005) ................................................................................20

*Richards v. United States*,
369 U.S. 1, 82 S. Ct. 585, 7 L. Ed. 2d 492 (1962) .................................................17

# TABLE OF AUTHORITIES (con't)

**Page(s)**

**Cases**

*S.W. v. New York City Dep't of Educ.*,
    646 F. Supp. 2d 346 (S.D.N.Y. 2009)......................................................................12, 19

*S.Y. v. New York City Dep't of Educ.*,
    210 F. Supp. 3d 556 (S.D.N.Y. 2016)....................................................................4, 5, 6, 14

*Sabatini v. Corning-Painted Post Area Sch. Dist.*,
    78 F. Supp. 2d 138 (W.D.N.Y. 1999) .....................................................................22, 27

*Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*,
    471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985) ....................................... Passim

*Scott ex rel. C.S. v. New York City Dep't of Educ.*,
    6 F. Supp. 3d 424 (S.D.N.Y. 2014).................................................................................5

*Scruggs v. Meriden Bd. of Educ.*,
    2007 WL 2318851 (D. Conn. Aug. 10, 2007) .............................................................12

*Serbin v. Bora Corp.*,
    96 F.3d 66 (3d Cir. 1996)...........................................................................................27

*Soria v. New York City Dep't of Educ.*,
    397 F. Supp. 3d 397 (S.D.N.Y. 2019)..........................................................................25

*Still v. DeBuono*,
    101 F.3d 888 (2d Cir. 1996).......................................................................................17

*Susquenita Sch. Dist. v. Raelee S. By & Through Heidi S.*,
    96 F.3d 78 (3d Cir. 1996)......................................................................................22, 27

*W.M. v. Lakeland Cent. Sch. Dist.*,
    783 F. Supp. 2d 497 (S.D.N.Y. 2011).........................................................................14

*Walczak v. Fla. Union Free Sch. Dist.*,
    142 F.3d 119 (2d Cir. 1998)...................................................................................5, 14

*Wall by Wall v. Mattituck-Cutchogue Sch. Dist.*,
    945 F. Supp. 501 (E.D.N.Y. 1996) ...............................................................................5

## TABLE OF AUTHORITIES (con't)

**Page(s)**

**Statutes**

20 U.S.C. § 1400 ...........................................................................................2, 3, 4, 5
20 U.S.C. § 1401(29) ..................................................................................................25
20 U.S.C. § 1412 (a) (10) (C) ....................................................................................24
20 U.S.C. § 1412 (a)(3) ................................................................................................6
20 U.S.C. § 1412(a)(1)(A) ..........................................................................................19
20 U.S.C. § 1412(a)(10)(C)(ii) ..........................................................................22, 23, 24
20 U.S.C. § 1415(b)(1) ................................................................................................10
20 U.S.C. § 1415(i)(2)(C)(iii) ............................................................................... Passim
20 U.S.C. § 1431(a)(5) ................................................................................................25
N.Y. Educ. Law § 4401(1) ..........................................................................................27
N.Y. Educ. Law § 4402(1)(b)(1) ..................................................................................6
N.Y. Educ. Law § 4404(1)(c) ......................................................................................6

**Rules**

Fed. R. Civ. P. 56 .........................................................................................................1

**Regulations**

34 C.F.R. § 300.132, 300.227, 300.307(b), 300.347 ...................................................18
34 C.F.R. § 300.321(a)(1) ............................................................................................10
34 C.F.R. § 300.322 (a) ................................................................................................10
34 C.F.R. § 300.322 (c), 300.328 .................................................................................10
34 C.F.R. § 300.33 .......................................................................................................10
34 C.F.R. § 300.501(b)(1) ............................................................................................10
N.Y. Comp. Codes R. & Regs. tit. 8, § 200.3(a)(1) ....................................................10
N.Y. Comp. Codes R. & Regs. tit. 8, § 200.5(d) .........................................................10

**Other Authorities**

136 Cong. Rec. H9632–01 ...........................................................................................26
136 Cong. Rec. S14410–02 ..........................................................................................26
150 Cong. Rec. S11658–01 ..........................................................................................26

## PRELIMINARY STATEMENT

Plaintiffs submit the within Memorandum of Law in support of their Motion for Summary Judgment under Fed. R. Civ. P. 56, which seeks an Order requiring the New York City Department of Education ("DOE") to directly pay their disabled student's (A.M.) full tuition and transportation costs for the 2018–2019 extended school year ("SY") to the International Institute for the Brain ("iBRAIN") and A.M.'s special transportation provider. Plaintiffs are entitled to summary judgment, as DOE conceded in the administrative hearings A.M. was denied a Free, and Appropriate Public Education ("FAPE") during the 2018–2019 SY. Both the Impartial Hearing Officer ("IHO") and State Review Officer ("SRO") held that Plaintiffs' unilateral placement was appropriate. A balancing of the equitable considerations further supports that total funding for Plaintiffs' unilateral placement at iBRAIN was appropriate, as nothing in the record suggests Plaintiffs were uncooperative in developing A.M.'s IEP[1], and therefore, the decisions of the IHO and SRO should be reversed and/or modified accordingly.

## STATEMENT OF FACTS

During the 2018–2019 SY, A.M. was an 8-years-old girl. A.M. is diagnosed with Traumatic Brain Injury, which manifests in various impairments, including cerebral palsy, seizure disorder, cortical visual impairment, developmental delays, severe hearing impairment in the left ear, and legal blindness. [R 1175]. A.M. is non-verbal and non-ambulatory, but can communicate using vocalizations, verbal approximations, sign language, eye gaze, facial expressions, and a speech-generating alternative and augmentative communication ("ACC") device. [Id.]. A.M. can walk with assistance while wearing knee-ankle-foot orthotics ("KAFO"). [R 1195]. Due to her disability, A.M. exhibits highly intensive management needs, requiring a high degree of individualized attention and

_____

[1] Individualized Educational Program.

1

intervention throughout the day. [R 1197]. As A.M. is a student with a disability and a resident of New York City, DOE has an obligation under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, to provide her with a FAPE for every SY. In the 2017–2018 SY, A.M. attended the International Academy of Hope ("iHOPE"), a private specialized educational program for children with brain injuries. [R 1047].

In early 2018, DOE's Committee on Special Education ("CSE") attempted to schedule an annual CSE meeting to develop A.M.'s IEP for the 2018–2019 SY. [R 0016]. Plaintiffs were unavailable on the first three dates DOE suggested. On April 19, 2018, Plaintiffs wrote a letter to the CSE requesting that: (a) a new meeting be scheduled on a Monday, (b) the meeting take place at iHOPE with iHOPE staff present, and (c) that the meeting include the in-person attendance of a district school physician. [Id.]. The CSE sent Plaintiffs a written notice, dated April 30, 2018, which stated that a new CSE meeting was scheduled for June 4, 2018, and noted that the meeting would not include a physician and would not be held at iHOPE. [Id.]. As a DOE physician would not be present, Plaintiffs did not attend the June 2018 meeting. Still, the CSE convened the meeting and developed an IEP for A.M. for the 2018–2019 SY in Plaintiffs' absence. [R 0008].

The IEP formulated at the June 2018 CSE meeting included a larger class size than A.M. had been receiving at iHOPE, failed to offer a 1:1 paraprofessional, and the recommended related service sessions that were much shorter than those provided to her at iHOPE. [R 0936-R 0937]. Plaintiffs were rightly dissatisfied with DOE's 2018–2019 recommendations for A.M. and sent DOE a Ten-Day Notice on June 21, 2018. [R 0009]. The Ten-Day Notice informed DOE of Plaintiffs' intention to unilaterally place A.M. at a different brain injury-focused private specialized education school, iBRAIN. [R 0009]. On July 9, 2018, Plaintiffs filed a Due Process Complaint ("DPC") alleging that DOE failed to offer A.M. a FAPE for the 2018–2019 SY, specifically contesting the recommendations

of a 12:1:(3+1) class ratio and 30-minute related services sessions. An Impartial Hearing began on September 30, 2018, and concluded on December 3, 2019, after twelve days of proceedings. [Id.].

A.M. attended iBRAIN for the entire 2018–2019 SY, receiving all academic and related services with individualized instruction. [R 1217]. Although iBRAIN was a new institution and had not fully implemented vision education services ("VES") for the first two months of the 2018–2019 SY, iBRAIN endeavored to make up for all missed VES services before the end of the school year. [R 0014]. On February 26, 2019, IHO Martin J. Kehoe III issued an Order of Pendency finding iBRAIN an appropriate pendency placement for A.M.'s 2018–2019 SY. [R 0045].

At an impartial hearing on March 26, 2019, DOE conceded they failed to provide A.M. with a FAPE during the 2018–2019 SY. [R 0283], [R 0315]. Subsequently, in his Finding of Fact and Decision ("FOFD") dated July 28, 2021, IHO Kehoe found (1) the district conceded it denied A.M. a FAPE for the 2018–2019 SY, (2) that iBRAIN was an appropriate unilateral placement, and (3) that a balancing of equities generally favored full reimbursement to Plaintiffs, except for the period between July 1, 2018, and September 16, 2018, when iBRAIN did not fully implement VES, for which the IHO penalized Plaintiffs. [R 0009]. IHO Kehoe ordered DOE to provide full reimbursement or direct payment to A.M.'s private school, iBRAIN, and transportation provider for the tuition and transportation costs from September 16, 2018, until the end of the 2018–2019 SY. [R 0037]. But the IHO ordered the district's payment be reduced by 50% for the period between July 1 and September 16, 2018, because of the lack of VES implementation at iBRAIN. [R 0009]. On September 7, 2021, Plaintiffs appealed the IHO's decision to the Office of State Review by serving a Request for Review ("RFR"). [R 0049]. In his October 28, 2021 decision, SRO Steven Krolak affirmed the holding of the IHO that DOE denied A.M. a FAPE for the 2018–2019 SY, and that iBRAIN was an appropriate unilateral placement. [R 0019]. At the same time, SRO Krolak disagreed with the IHO on his reasoning for reducing Plaintiffs' relief. SRO Krolak stated that the lack of full

3

implementation of vision services at iBRAIN for the first two months of the school year does not constitute an equitable basis to reduce Plaintiffs' award, and the IHO erred in ordering a reduction on that basis. [R 0015–R0016].

But the SRO penalized Plaintiffs further and ordered the reduction of DOE's payment to 80% of tuition and transportation costs, because he agreed with DOE's argument that Plaintiffs' lack of attendance at the June 2018 CSE meeting impeded the development of A.M.'s IEP. [Id.]. Additionally, SRO Krolak contended IHO Kehoe erred in ordering direct payment as a form of relief because Plaintiffs had not shown an inability to pay. [R 0018]. SRO Krolak determined that Plaintiffs can only receive reimbursement of 80% of iBRAIN's tuition and transportation costs upon showing proof of payment in the first instance. [R 0019].

## LEGAL STANDARD

In a district court proceeding under the IDEA, the parties and the court typically style the decision as a ruling on a motion for summary judgment, but "the procedure is in substance an appeal from an administrative determination, not a summary judgment motion." *Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*, 990 F.3d 152, 165 (2d Cir. 2021); *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012). The district court, therefore, "engages in an independent review of the administrative record and make[s] a determination based on a preponderance of the evidence." *BOE of Yorktown* , 990 F.3d at 165; *M.H.*, 685 F.3d 217.

The motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures outlined in the IDEA in developing an IEP and determining whether a challenged IEP is reasonably calculated to enable a child to receive educational benefits." *S.Y. v. New York City Dep't of Educ.*, 210 F. Supp. 3d 556, 565 (S.D.N.Y. 2016).[2] Courts have noted that "[s]ummary

---

[2] *See also M.H. v. N.Y.C. Dep't of Educ.*, 217; *See also*, *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 (2d Cir. 2005).

judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions," but that "[t]he inquiry... is not directed to discerning whether there are disputed issues of fact, but whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." *Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ.*, 550 F. Supp. 2d 420, 429 (S.D.N.Y. 2008).[3] Accordingly, a motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact. *S.Y.*, 210 F. Supp. 3d at 565; *Lillbask ex rel. Mauclaire*, 397 F.3d at 83. In such cases, the court conducts an independent judicial review and bases its decision on the preponderance of the evidence. *Scott ex rel. C.S. v. New York City Dep't of Educ.*, 6 F. Supp. 3d 424, 435 (S.D.N.Y. 2014).

## IDEA'S LEGAL FRAMEWORK

The IDEA was enacted to ensure that all children with disabilities receive an educational program that sufficiently addresses their unique needs, and to provide legal protections to disabled children and their families when their needs are not being addressed.[4] Under IDEA, state and local governments must provide all students with disabilities with a FAPE that is "reasonably calculated to enable the child to receive educational benefits."[5] School districts provide a student with a FAPE when they have (a) complied with the procedural requirements of IDEA and (b) formulated an IEP for the student reasonably calculated to enable him/her to receive educational benefits.[6] A student's IEP determinations must be based on their specific and unique needs, and may not rely on disability

---

[3] *See also Wall by Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F. Supp. 501, 508 (E.D.N.Y. 1996); *Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F. Supp. 2d 710 (S.D.N.Y. 2003).
[4] *See* 20 U.S.C. § 1400[d][1][A]-[B] and *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206–07, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982).
[5] *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006), quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998).
[6] *See  Board of Educ. of Hendrick Hudson Central School Dist., Westchester County*, 458 U.S. at 206–07  and  *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).

classification.[7] In New York City, DOE convenes a CSE to develop each disabled child's IEP. N.Y. Educ. Law § 4402(1)(b)(1). The CSE is generally a team of parents, educators, and specialists who assess the student's current needs and skill sets to formulate an education program that will provide that student with a FAPE.[8] While DOE is obligated under the IDEA to provide parents with a meaningful opportunity to attend CSE meetings and participate in IEP development, parents need not contribute to the decision-making.[9] When parents believe DOE denied their child a FAPE, the IDEA allows them to unilaterally enroll their child in a private school and request tuition reimbursement or funding from the school district.[10] To obtain his financial relief, the parents must file a DPC to initiate administrative proceedings, where hearing officers generally use an analysis known as the *Burlington/Carter* test to determine whether parents are entitled to relief. The *Burlington/Carter* analysis entails three prongs that must be proven for the Court to order reimbursement: (1) the school district's recommended program did not offer the student a FAPE ("Prong I"), (2) the unilateral private school placement selected by the parents is appropriate to meet the student's needs ("Prong II"), and (3) a balancing of the equitable considerations favors reimbursement to the parents ("Prong III").[11]

Under N.Y. Educ. Law § 4404(1)(c) the school district bears the initial burden of proving the appropriateness of their IEP for the student. If the school district fails to prove they offered the student a FAPE, then the burden switches to the parents to prove that their unilateral placement was appropriate and that a balancing of equities weighs in their favor.[12] Under Prong I, the district must prove that their IEP recommendations for the student were reasonably calculated to allow them to receive educational benefits. *See Frank G.*, 459 F.3d at 363. Under Prong II, the parents bear the

---

[7] *See* 20 U.S.C. § 1412 (a)(3); *F.O. v. New York City Dep't of Educ.*, 976 F. Supp. 2d 499, 525 (S.D.N.Y. 2013).

[8] *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).

[9] *See, E. Z.-L. ex rel. R.L. v. New York City Dep't of Educ.*, 763 F. Supp. 2d 584, 596 (S.D.N.Y. 2011), *aff'd sub nom. R.E. v. New York City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012).

[10] *S.Y.*, 210 F. Supp. 3d 556, citing *M.O. v. New York City Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (per curium).

[11] *See Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 114 S. Ct. 361 (1993).

[12] *S.Y.*, 210 F. Supp. 3d 556, *citing R.E.*, 694 F.3d at 184–85; N.Y. Educ. Law § 4404(1)(c).

burden of demonstrating that the placement was reasonably calculated to enable the student to receive educational benefits. *Id.* at 364. If the placement provides an educational program specifically designed to meet the student's unique needs, it will be deemed appropriate, whether or not it maximizes the student's potential. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112–15 (2d Cir. 2007). After Prongs I and II have been proven, the court will turn to Prong III and consider relevant equitable factors in determining the kind and amount of relief to be awarded to Plaintiffs.[13] The IDEA gives courts broad discretion to fashion appropriate relief to parents where Prongs I and II of the *Burlington/Carter* framework have been satisfied. *Frank G.*, 459 F.3d at 371–72 citing, 20 U.S.C. § 1415(i)(2)(C)(iii). A school district is precluded from asserting that the equities weigh in its favor when it concedes it failed to provide the student with a FAPE.[14] A reduction or denial of the parents' relief may be ordered only if the district proves the Parent failed to raise the appropriateness of an IEP timely, failed to make the child available for evaluations, or otherwise acted unreasonably.[15, 16]

## ARGUMENT

**POINT I:      DOE DID NOT OFFER A.M. A FAPE, AND PLAINTIFFS'
                CHOICE OF UNILATERAL PLACEMENT WAS APPROPRIATE**

Prongs I and II of the *Burlington/Carter* analysis are not at issue, as DOE conceded in the underlying hearings that it denied A.M. a FAPE during the 2018–2019 SY. The IHO and SRO properly held A.M's unilateral placement at iBRAIN was appropriate. In his Decision,[17] SRO Krolak

---

[13] *See, Jennifer D. ex rel. Travis D.*, 550 F. Supp. 2d at 429.

[14] *See N.R. ex rel. T.R. v. Dep't of Educ. of City Sch. Dist. of City of New York*, No. 07 CV. 9648 (BSJ), 2009 WL 874061 (S.D.N.Y. Mar. 31, 2009) ("Court is unaware of, any case in which equitable considerations favored a school district that failed to offer a disabled child a school placement prior to the commencement of the school year"). *Id.* at *7.

[15] *See C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 840 (2d Cir. 2014).

[16] When reviewing the administrative hearing decisions on appeal, district courts generally must give "due weight" to the findings of the administrative officers, but courts need not defer to the administrative officers when the issues involve interpretations of law, such as the statutory provisions of IDEA. *Muller on Behalf of Muller v. Comm. on Special Educ. of E. Islip Union Free Sch. Dist.*, 145 F.3d 95, 101 (2d Cir. 1998); *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114 (2d Cir. 1997).

[17] SRO Krolak issued SRO Decision No. 21-189 on October 28, 2021. [R 0006-0019].

noted that "the district has not cross-appealed from the IHO's finding that the district failed to offer the student a FAPE for 2018-19 SY and, therefore, that determination has become final and binding on the parties and will not be further discussed." [R 0011]. He later adds that a "review of the evidence in the hearing record supports a finding that iBRAIN provided a program and placement appropriate to meet the student's needs during the 2018-2019 [SY]." [R 0011]. As Plaintiffs prevailed on Prongs I and II in the underlying hearings, the remaining issues are whether balancing the equities under Prong III favors total funding and whether direct retrospective payment is an appropriate remedy.

**POINT II:      SRO ERRED IN FINDING THAT EQUITABLE CONSIDERATIONS
                 <u>DID NOT SUPPORT FULL RELIEF TO PLAINTIFFS</u>**

*A.  The IHO Improperly Held that the Initial Lack of Vision Services at iBRAIN Warranted a
     Reduction of Relief*

Once Prongs I and II have been satisfied, Prong III of the *Burlington/Carter* framework requires a school district to reimburse the parents for their private school placement expenditures, where equitable considerations support it. *Florence County School Dist. Four*, 510 U.S. 7; *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–70, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985). IHO Kehoe found that a balancing of equities under Prong III supported awarding relief to Plaintiffs, yet erroneously reduced Plaintiffs' financial award due to iBRAIN's delayed implementation of VES for the first two months of the 2018-2019 SY. In doing so, IHO Kehoe contradicts himself by first finding iBRAIN to be a suitable placement under Prong II and then using iBRAIN's initial lack of VES implementation to alter the balance of equities and decrease Plaintiffs' relief. Under Prong II, parents must show that the unilateral private placement they chose is "proper under the Act."[18] To be proper under the Act, the placement need not provide every special service

_____

[18] *See Gagliardo*, 489 F.3d at 112–15.

necessary to maximize the student's potential.[19] The placement is appropriate if it offers an academic program tailored to the student's unique needs.[20]

IHO Kehoe unequivocally confirmed that Plaintiffs satisfied Prong II [R 0035] yet makes a "judgment call under Prong III" to have the parties divide tuition and transportation fees from July 1, 2018, to September 16, 2018, due to the absence of vision services at iBRAIN during those two months.[R 0036]. IHO Kehoe's acknowledgment that the absence of vision services "may theoretically constitute a Prong II problem," is disregarded under his Prong II analysis, leading to an incongruous result.

An award of tuition funding may be reduced when the equities so require, such as when a parent fails to timely raise the appropriateness of an IEP, fails to make their child available for an evaluation or otherwise behaves unreasonably. *C.L.*, 744 F.3d at 840. iBRAIN's inability to completely implement VES for two months is not the parents' fault, nor should it affect balancing the equities when the educational program was otherwise appropriate, particularly when the IHO determined the deficiency insignificant. SRO Krolak also correctly found iBRAIN was an appropriate placement and, unlike the IHO, found that the less than full implementation of services at iBRAIN was not an equitable basis to reduce tuition reimbursement. [R 0015-R0016].[21]

### B. The SRO Improperly Held that a Reduction of Relief was Supported by Lack of Parent Participation

SRO Krolak improperly reduced Plaintiffs' award due to their non-attendance at the 2018 CSE meeting and iHOPE's failure to produce its progress reports, an issue the IHO never addressed. Plaintiffs' absence was insufficient to obstruct the development of A.M.'s IEP, and iHOPE – not Plaintiffs – was responsible for furnishing the CSE with the most recent progress reports.

---

[19] *See Gagliardo*, 489 F.3d 105, *quoting Frank G.*, 459 F.3d at 364.
[20] *Id.*
[21] The SRO's analysis on this point was well reasoned and should enjoy deference because, as explained in detail above, both the IHO and SRO found iBRAIN's educational program was specifically designed to meet the unique needs of A.M.

School districts are required to allow the parents of a disabled student to attend the CSE meeting and participate in the formulation of the student's IEP[22]. DOE must ensure that the IEP team for a student with disabilities includes, *inter alia*, the student's parents.[23] There is no correlating requirement that a student's parent must be a member of the IEP team for an IEP to be created.[24] Because Parents are required to be members of the IEP team, a school district must make every effort to schedule an IEP meeting at a mutually agreed-upon time and location.[25] The burden is on districts like DOE to show that they took affirmative steps to try and secure the Parent's participation at the IEP meeting. *See Mr. "M" ex rel "K.M." v. Ridgefield Bd. of Educ.*, No. 3:05-CV-584RNC, 2007 WL 987483, at *6 (D. Conn. Mar. 30, 2007).

DOE cannot excuse its failures by blaming the Parents. *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1055 (9th Cir. 2012). The public agency "responsible for providing education to children with disabilities" (34 C.F.R. § 300.33) is required to "take steps to ensure that one or both of the parents of a child with a disability are present at each IEP meeting or are afforded an opportunity to participate" including providing ample notice and "scheduling the meeting at a mutually agreed on time and place." 34 C.F.R. § 300.322 (a). *Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1044 (9th Cir. 2013). If a parent cannot attend, the agency must offer other methods of participation, such as video or teleconferencing. *Id.,* 34 C.F.R. § 300.322 (c), 300.328. Most importantly, a meeting may *only* be conducted without a parent if "the public agency is *unable* to convince the parents that they should attend." *Id.*, § 300.322 (d) (emphasis added). In that circumstance, the agency must keep a detailed record of its attempts to include the parent. *Id.*

---

[22] 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.501(b)(1); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.5(d).
[23] 34 C.F.R. § 300.321(a)(1); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.3(a)(1).
[24] *See, E. Z.-L. ex rel. R.L.*, 763 F. Supp. 2d at 596 ("while a school district is required to ensure that parents can participate in formulating their child's general educational program, it is not required to involve them in its decision regarding the specific placement recommendation for the child").
[25] *Id.*

Courts have held that parental involvement in the creation process requires the district to include the parents in an IEP meeting under the IDEA and its regulations unless they *affirmatively refuse to attend. Doug C.*, 720 F.3d at 1044. Plaintiffs in this matter never refused to participate in A.M.'s IEP process, attend meetings, and provide consent for documents or private school observations requested by DOE. Plaintiffs never missed a scheduled meeting that they said they would attend. Indeed, the IHO recognized that Plaintiffs maintained DOE failed to hold an annual review meeting at a time that was agreeable to Plaintiffs and held the meeting in their absence and ignored Plaintiffs' written request for a full committee CSE meeting and requests that the DOE physician attend the IEP meeting. [R 0027]. The IHO did not mention any lack of parental participation; rather, he noted, "The Parent has also worked to facilitate the appropriate provision of myriad services for the Student." [R 0037].

SRO Krolak conducted no analysis regarding parental participation. He generally provided a chronology of communications between Plaintiffs and DOE, noted Plaintiffs' absence from the June CSE meeting, and absence of A.M.'s nonpublic school staff at the meeting and found,

> "Based on the above, the parent's actions impeded the process leading up to the June 2018 CSE meeting, and that, along with the failure to provide private school progress reports and the refusal to attend the June CSE meeting itself after it was re-scheduled to meet the parent's scheduling preferences, was unreasonable."

[R 0017]. By failing to explain how Plaintiffs' actions impeded the IEP process, SRO Krolak's reduction in Plaintiffs' award is *per se* unreasonable.

Under certain circumstances, a district's failure to include the Parent in the IEP process can amount to a denial of FAPE. In *Doug C.*, the Ninth Circuit analyzed the importance of parental participation and held:

> "The fact that it may have been frustrating to schedule meetings with or difficult to work with Doug C. (as the Department repeatedly suggests) does not excuse the Department's failure to include him in Spencer's IEP meeting when he expressed a willingness to participate. **We have consistently held that an agency cannot eschew its affirmative duties under the IDEA by blaming the parents**…**An agency cannot blame a parent for its failure to ensure meaningful procedural compliance with the IDEA because the IDEA's protections are designed to benefit the Student, not the Parent**…**Because the Department's obligation is owed to the child, any alleged obstinance of Doug C. does not excuse the Department's failure to fulfill its affirmative obligation to include Doug C. in the IEP meeting when he expressed a willingness (indeed eagerness) to participate, albeit at a later date**."

*Doug C.*, 720 F.3d at 1045 (emphasis added). See also, *Scruggs v. Meriden Bd. of Educ.*, No. 3:03-CV-2224(PCD), 2007 WL 2318851, at *34 – 35 (D. Conn. Aug. 10, 2007).

Plaintiff's conduct does not approach the level of uncooperativeness courts have found to warrant a denial of reimbursement of funding on equitable grounds. *R.B. v. New York City Dep't of Educ.*, 713 F. Supp. 2d 235, 248 (S.D.N.Y. 2010).[26] The record bears out Plaintiffs' active engagement in the IEP process with the school. The record does not suggest that Plaintiffs acted with the requisite level of unreasonableness or misconduct such that reimbursement should be denied on equitable grounds, the equities do not weigh against reimbursement. *R.B.*, 713 F. Supp. 2d at 249; *Jennifer D. ex rel. Travis D.*, 550 F. Supp. 2d at 437. Despite Plaintiffs' failure to attend the June meeting, the CSE convened and developed an IEP for A.M. for the 2018–2019 SY. While the resulting IEP was inadequate and amounted to the denial of a FAPE, it was not attributable to Plaintiff's absence from the meeting. Indeed, if Plaintiffs' absence caused DOE's failure to provide A.M. with a FAPE, DOE would have so argued in support of its burden under Prong I, but did not. Instead, DOE conceded Prong I, admitting it failed to provide A.M. with a FAPE, without arguing that Plaintiffs' failure to attend the CSE meeting prevented the development of A.M.'s IEP. Plaintiffs' failure to attend the CSE meeting was not unreasonable, nor did it obstruct DOE's ability to develop an IEP for A.M. It certainly was not the type of behavior that justifies or warrants a reduction in Plaintiffs' relief.

---

[26] *See S.W. v. New York City Dep't of Educ.*, 646 F. Supp. 2d 346, 364 (S.D.N.Y. 2009) (finding the equities weighed against reimbursement where parent signed an enrollment contract with a private school agreeing to reject the public school placement two months before even visiting the proposed public school); *Bettinger v. New York City Bd. of Educ.*, No. 06 CV 6889 (PAC), 2007 WL 4208560, at *8 (S.D.N.Y. Nov. 20, 2007) (denying reimbursement on equitable grounds where parents refused to visit the two schools proposed by the district); *Carmel Cent. Sch. Dist. v. V.P. ex rel. G.P.*, 373 F. Supp. 2d 402, 416 (S.D.N.Y. 2005), *aff'd sub nom. Carmel Cent. Sch. Dist. v. V.P.*, 192 F. App'x 62 (2d Cir. 2006) (finding parents were not equitably entitled to tuition reimbursement where they "never had the slightest intention of allowing the child to be educated in the public school and did everything possible so that they could frustrate a timely review of [the child's] condition" before enrolling the child in private school).

Concerning A.M.'s progress reports – according to SRO Krolak, the CSE repeatedly sought those reports from A.M.'s former private school, iHOPE, but did not get them. iHOPE's failure to produce A.M.'s progress reports is not Plaintiffs' fault as they have no control over the actions of iHOPE or its representatives. Thus, the absence of these reports at the CSE meeting should not have been a basis for the SRO to punish Plaintiffs and reduce their relief. Finally, IHO Kehoe never discussed, or even mentioned, Plaintiffs' absence from the June CSE meeting or the failure of iHOPE to produce progress reports at such meeting in his Prong III analysis – which he likely would have done if either had impeded DOE's ability to formulate A.M.s IEP or had any significance to the equitable considerations. Consequently, that portion of SRO Krolak's Decision that found equitable considerations justified a 20% reduction in Plaintiffs' request for total funding for A.M.'s placement at iBRAIN should be vacated, reversed, and/or modified to hold that equitable consideration favor granting Plaintiffs' total reimbursement/funding for A.M.'s educational program at iBRAIN, related services, including transportation, for the 2018-2019 SY. Plaintiffs submit that an Order and Judgment reflecting the foregoing should be issued.

### C.  The SRO's Decision to Reduce Plaintiffs' Relief as Part of its Prong III Analysis was Erroneous and Otherwise Not Entitled to Deference

SRO Krolak's holding that Plaintiffs' actions leading up to, and including, their failure to attend the CSE meeting impeded the IEP process and were unreasonable was not rooted in "sound educational policy" but was a conclusory opinion bereft of analysis. As previously indicated, the SRO's Decision that Plaintiffs' absence from the CSE meeting constituted unreasonable or obstructive conduct is incorrect, especially considering that IHO Kehoe did not refer to the Plaintiffs' lack of participation in his Prong III analysis. The Second Circuit has held that, while the decisions of underlying hearing officers are to be given "due weight" by district courts, SRO decisions are still subject to independent judicial review, and "due weight" need not be given where the issues are

matters of law. *Mrs. B.*, 103 F.3d 1114. That said, district courts are discouraged from substituting their ideas of "sound educational policy" for those of the school authorities they review. *Walczak*, 142 F.3d at 129; *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County*, 458 U.S. 176. The deference owed to an SRO's decision depends on the quality of that opinion. *S.Y.*, 210 F. Supp. 3d at 566; *See R.E., 694 F.3d at 189*. Courts may consider whether the decision being reviewed is well-reasoned and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court. *S.Y.*, 210 F. Supp. 3d at 566; *See R.E., 694 F.3d at 189*.

The deference owed to the administrative decisions may be 'less weighty' when it comes to reviewing whether the equities support a reimbursement award— *i.e.,* the third factor of the *Burlington–Carter* analysis. *A.R. ex rel. F.P. v. New York City Dept. of Educ.*, 12 CIV. 4493 PAC, 2013 WL 5312537, at *5 (S.D.N.Y. Sept. 23, 2013).[27] That is because "where the issue in dispute is the balancing of the equities, [it is] a matter as to which district courts not only have particular expertise but also broad discretion." *A.R. ex rel. F.P.*, 2013 WL 5312537, at *5; *W.M. v. Lakeland Cent. Sch. Dist.*, 783 F. Supp. 2d 497, 504 (S.D.N.Y. 2011)( (explaining that district courts have "particular expertise" and "broad discretion" when engaging in a "balancing of the equities").

SRO Krolak's reasoning for reducing Plaintiffs' award under his Prong III analysis is not rooted in educational policy or the IDEA[28] – as such, the Court need not give the SRO's decision deference. Burlington's Prong III analysis balancing equitable considerations is subject to an independent review by the district court. The evidence developed at the administrative hearings here does not demonstrate by a preponderance of the evidence that Plaintiffs frustrated the IEP development process by not

---

[27] *See also, J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 659 (S.D.N.Y. 2011).
[28] SRO Krolak created a requirement that Plaintiffs participate in their child's IEP process, which does not exist in the IDEA – the Act gives Plaintiffs the RIGHT to participate in a process from which they were too often excluded, not the necessarily the obligation. The obligation is on the distrct to include the Parents.

attending the CSE meeting. The SRO's Prong III equitable considerations analysis deserves no deference and is not supported by a preponderance of evidence in the record of the administrative proceedings. The SRO's 20% reduction in Plaintiffs' relief/tuition reimbursement should be reversed.

**POINT III:** **DIRECT RETROSPECTIVE TUITION IS AVAILABLE UNDER THE IDEA, AND SRO IMPROPERLY DENIED PLAINTIFFS SUCH RELIEF**

SRO Krolak improperly and gratuitously reversed the IHO's Order requiring DOE to provide reimbursement to Plaintiffs or direct payment to iBRAIN and A.M.'s special transportation provider for the 2018–2019 SY, and erroneously held DOE is only obligated to fund A.M.'s appropriate placement at iBRAIN upon Plaintiffs' proof of payment shown to DOE. SRO Krolak's holding is unsupported by caselaw in the Southern District, or otherwise. On the contrary, Courts in the Southern District have found it ***proper*** in certain IDEA cases for a Court to Order direct retrospective funding, and there is nothing in the relevant caselaw that creates an explicit requirement for parents to show an inability to pay in order to get such funding. The IDEA ensures that all children receive a FAPE and achieves this goal, in part, by allowing courts to fashion any such relief as they find appropriate where the parents have met Prongs I and II of the *Burlington/Carter* framework. *Frank G.*, 459 F.3d at 371–72, citing 20 U.S.C. § 1415(i)(2)(C)(iii). SRO Krolak cites *Mr. and Mrs. A. ex rel.* to justify his finding, where the Court held,

> "[W]here, as here, parents lack financial resources to 'front' the costs of private school tuition, and in the rare instance where a private school is willing to enroll the student and take the risk that the parents will not be able to pay tuition costs… parents who satisfy the <u>Burlington</u> factors have a right to retroactive direct tuition payment relief."

*Mr. and Mrs. A. ex rel. D.A.*, 769 F. Supp. 2d at 428.

SRO Krolak attempts to construe this quote as creating a fourth Prong in the *Burlington/Carter* framework that requires Plaintiffs to prove their inability to pay before being awarded retroactive/retrospective direct pay. But in the quote from *Mr. and Mrs. A*, Judge Gardephe merely identifies one of the possible scenarios in which parents can be given direct retrospective pay.

Nowhere, in that case, does the Court hold that **only if** the parent is financially unable to front the tuition costs, are they entitled to direct retrospective pay by the district. Thus, the SRO's attempt to create a fourth Prong to *Burlington/Carter* analysis is misguided and inappropriate.[29]

Immediately preceding the above quote in *Mr. and Mrs. A*, the Court noted, "[w]here parents have the financial resources to enroll their child in an appropriate private school, they **may** do so and seek retroactive reimbursement in a due process hearing." *Mr. and Mrs. A. ex rel. D.A.*, 769 F. Supp. 2d at 428 (emphasis added). The Court was merely pointing out that parents with the financial means to front tuition costs can do so and receive reimbursement. But nowhere does the Court hold or find that parents who technically have the financial means **must** front the costs and seek reimbursement rather than wait for the district to fund the school directly. Such a holding would frustrate the intent and purpose of the IDEA and its amendments and would create a perilously slippery slope because there is no clear definition of what constitutes the ability or inability to pay.

### A.  IDEA Grants Courts Broad Remedial Authority to Accomplish Legislative Policy

Because the IDEA was intended to give children with disabilities both an appropriate education and a free one, it should not be interpreted to defeat one or the other of those objectives. *Frank G.*, 459 F.3d at 372 (internal quotation marks omitted) quoting *School Committee of Town of Burlington, Mass.*, 471 U.S. at 372; *see also*, *Florence County School Dist. Four*, 510 U.S. at 12–13;

---

[29] In its Brief submitted in *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442 (2d Cir. 2014), the DOE suggested that *Mrs. A.* added a "fourth Prong" to the *Burlington* analysis, "requiring proof of a legal obligation to pay the tuition but an inability to do so". [Case 11-1427 Dkt. No. 82 Page 37 of 54]. There is no indication in *Mr. and Mrs. A.* that the court intended any such a requirement. In fact, the court noted that its analysis would apply "in the rare instance where a private school is willing to enroll the student and take the risk that the parents will not be able to pay tuition costs–or will take years to do so." *Mr. and Mrs. A. ex rel. D.A.*, 471 U.S. at 428. Some courts correctly observe that *Burlington* established **a two-part test** to determine whether a parent is entitled to reimbursement for a unilateral private school placement: The first part of the test determines whether the IEP proposed by the school district was inappropriate and the second part of the test determines whether the unilateral private school placement is appropriate. *Jennifer D. ex rel.* (citing *Jennifer D. ex rel. Travis D.*, 550 F. Supp. 2d at 429, citing *Gagliardo*, 489 F.3d at 111–12; *School Committee of Town of Burlington, Mass.*, 471 U.S. at 370. If the two-part *Burlington* test is satisfied, the court has the discretion to consider relevant equitable factors in fashioning relief. *Jennifer D. ex rel. Travis D.*, 550 F. Supp. 2d at 429, citing *Gagliardo*, 489 F.3d at 112, (citing *Florence County School Dist. Four*, 510 U.S. at 16).

16

*Still v. DeBuono*, 101 F.3d 888, 893 (2d Cir. 1996). The IDEA provides courts broad remedial authority to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Courts have consistently read this language to encompass a wide variety of remedies and construe the details and language of the Act in conformity with its dominating general purpose to carry out the Act's legislative policy. *Frank G.*, 459 F.3d at 371, *citing Sec. & Exch. Comm'n v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 350–51, 64 S. Ct. 120, 88 L. Ed. 88 (1943), *judgment entered sub-nom Sec. & Exch. Comm'n v. C M Joiner Leasing Corp*, 53 F. Supp. 714 (N.D. Tex. 1944).[30]

One of the primary ways the IDEA seeks to ensure that children with disabilities receive a free appropriate education is by conferring broad discretion on the district court to grant relief it finds appropriate to parents of disabled children who select a unilateral private placement when the parents' placement is found to be proper, and the proposed IEP is inadequate. *Frank G.*, 459 F.3d at 371–72, *citing* 20 U.S.C. § 1415(i)(2)(C)(iii). While how the authority is exercised may be guided by the various subsections of § 1412(a)(10), which mainly codified existing law in significant respect,[31] nothing in the legislative history (to be discussed shortly) suggests Congress sought to alter prior law in a manner that constrains the power of a district court judge to award reimbursement for a private placement where a FAPE had not been provided under the circumstances presented here. *Id.* Indeed, the rules of statutory construction require that ambiguous statutes be construed to avoid absurd results. *Frank G.*, 459 F.3d at 372. In *Burlington,* Justice Rehnquist explained the reasoning of the Court's decision as follows:

> The statute directs the court to "grant such relief as [it] determines is appropriate." The ordinary meaning of these words confers broad discretion on the court. The type of relief is not further specified, except that it must be "appropriate." Absent other reference, the only possible interpretation is that the relief is to be "appropriate" in light of the purpose of the Act. As already noted, this is principally to provide handicapped children with "a free

---

[30] *See also Richards v. United States*, 369 U.S. 1, 11, 82 S. Ct. 585, 7 L. Ed. 2d 492 (1962); *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.), *aff'd*, 326 U.S. 404, 66 S. Ct. 193, 90 L. Ed. 165 (1945) ("[S]tatutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.") (Hand, L., J.) (quoted with approval in *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 455, 109 S. Ct. 2558, 105 L. Ed. 2d 377 (1989)).
[31] *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 69 n. 9 (2d Cir. 2000).

appropriate public education, which emphasizes special education and related services designed to meet their unique needs." The Act contemplates that such education will be provided where possible in regular public schools, with the child participating as much as possible in the same activities as non-handicapped children, but the Act also provides for placement in private schools at public expense where this is not possible. *See* § 1412(5); 34 C.F.R. § 300.132, 300.227, 300.307(b), 300.347.

*School Committee of Town of Burlington, Mass.*, 471 U.S. at 369–70.   While the specific remedy awarded to the parents in *Burlington* was tuition reimbursement, the Supreme Court analyzed the tuition payment remedy, to begin with, in terms of prospective payment directly to the private school:

> "In a case where a court determines that a private placement desired by the parents was proper under the Act and that an IEP calling for placement in a public school was inappropriate, it seems clear beyond cavil that `appropriate' relief would include a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school."

*Id.* The more challenging question in *Burlington* was the availability of reimbursement, a remedy mischaracterized by the Town therein as "damages." See *id.* The Court concluded that, for many parents, prospective tuition payments would not be an adequate remedy for the denial of FAPE:

> If the administrative and judicial review under the Act could be completed in a matter of weeks, rather than years, it would be difficult to imagine a case in which such prospective injunctive relief would not be sufficient. As this case so vividly demonstrates, however, the review process is ponderous. A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by that IEP has passed. In the meantime, the parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement. If they choose the latter course, which conscientious parents who have adequate means and who are reasonably confident of their assessment normally would, it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials. If that were the case, the child's right to a free appropriate public education, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards would be less than complete. *Id.*

Reasoning that Congress could not have intended to present the parents of children with disabilities with such an untenable choice, the court held that "by empowering the court to grant `appropriate' relief, Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case." *Id.* The Court further held that reimbursement does not constitute damages, as it "merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." *Id.* at 370–71.

18

The remedy in *Burlington* was tailored to the facts before the Supreme Court; there, the parent had "adequate means" to pay the private-school tuition in advance. That said, the Court's reasoning applies with equal force to an award of direct retroactive tuition payments. As the Court noted above, the relief awarded in IDEA proceedings is to be "appropriate" in light of the purpose of the Act. Here, direct retrospective payment is appropriate under IDEA where the Plaintiffs are contractually obligated to pay for tuition and related services provided by A.M.'s nonpublic providers, and the Plaintiffs received the benefit of the nonpublic school's education, as well as the related services afforded to the A.M. such as special transportation.

If such a remedy were unavailable, the procedural rights of parents with limited financial means and their children's right to a FAPE would be, in the words of the *Burlington* Court, "less than complete." Particularly where, as here, the SRO did not remand the matter to the IHO for further development of the record. Moreover, direct retrospective tuition payment, like reimbursement, merely requires a school district like DOE to pay an expense it should have paid all along and would have paid in the first instance if it had provided the student a FAPE. Indeed, *Burlington* addressed reimbursement only in response to the practical need, in some cases, for parents to pay tuition prior to resolving a dispute; as much as such a necessity does not arise, direct tuition payment is the original remedy envisioned by the Court.

Here, direct retrospective tuition payment would merely force DOE to "belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP"[32] because the IDEA requires DOE to provide Plaintiffs with a FAPE at public expense. *See* 20 U.S.C. § 1412(a)(1)(A); *S.W. v. New York City Dep't of Educ.*, 646 F. Supp. 2d 346, 358–59 (S.D.N.Y. 2009).

---

[32] *School Committee of Town of Burlington, Mass.*, 471 U.S. at 370–71.

### B. Various Federal Courts Have Fashioned Tailor-Made Remedies in IDEA Cases

Since *Burlington*, several Circuit courts have granted diverse remedies tailored to the IDEA cases before them. See, *e.g., Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1286 (11th Cir. 2008) (awarding prospective placement in a private school as a compensatory remedy for past failures to provide FAPE); *Reid ex rel. Reid v. D.C.*, 401 F.3d 516, 522–23 (D.C. Cir. 2005) (awarding student compensatory tutoring services). In *Draper*, the Eleventh Circuit found that the district court was free to fashion appropriate relief for the Plaintiff irrespective of the options discussed by the administrative-law judge. *Draper*, 518 F.3d at 1285. Upholding the district court's award of prospective placement in a private school as compensatory education,[33] the Circuit concluded that a "prospective injunction that requires a placement in a private school is appropriate 'beyond cavil' when an educational program 'calling for placement in a public school [is] inappropriate,'" *Id.* at 1285 (quoting *School Committee of Town of Burlington, Mass.*, 471 U.S. at 370). The court explained:

> The School System argues that Draper's award is different from an award of reimbursement, but reading "appropriate" as requiring prospective placement in a public school, as the School System argues, would create an anomaly in the law…If the district court could not prospectively award Draper a placement in a private school, Draper would be worse off with an award of prospective education than he would be with a retroactive award of reimbursement for the same violations of the Act …The argument of the School System would provide those wealthier parents greater benefits under the Act than poorer parents.

*Id.* at 1286. The IDEA requires "appropriate" relief, and "the only possible interpretation is that the relief is to be 'appropriate' in light of the purpose of the Act." *Draper*, 518 F.3d at 1285, *citing School Committee of Town of Burlington, Mass.*, 471 U.S. at 369. "'[E]quitable considerations are relevant in fashioning relief,' [34] and the court enjoys 'broad discretion' in so doing. *Id.*; *School Committee of Town of Burlington, Mass.*, 105 S. Ct. at 2002; *Florence County School Dist. Four,* 510 U.S. at 16. The Act does not expect families who lack resources to place their children in private schools to shoulder the burden of proving that the public school cannot adequately educate their child

---

[33] *Draper*, 518 F.3d at 1285, 1290.
[34] *School Committee of Town of Burlington, Mass.*, 471 U.S. at 374.

before those parents can obtain a placement in a private school. *Draper*, 518 F.3d at 1286. Instead, the Act empowers the district court to use broad discretion to fashion appropriate equitable relief. *Id.*

In *P.K. ex rel. S.K.,* after finding the student had been denied a FAPE, a district court in the Eastern District of New York was called to decide whether DOE could properly be ordered to pay tuition directly to the student's private school, where the parents had paid no tuition. *P.K. ex rel. S.K. v. New York City Dep't of Educ. (Region 4)*, 819 F. Supp. 2d 90, 118 (E.D.N.Y. 2011). The court turned to a then-recent case of first impression (*Mr. & Mrs. A. passim)*, which addressed the same issue and held that where parents have prevailed on each of the three prongs of the *Burlington–Carter* test, the IDEA authorizes a court "to award retroactive direct payment of private-school tuition." *Mr. and Mrs. A. ex rel. D.A.*, 769 F. Supp. 2d  at 427.  The Court in *P.K.  ex rel.* found Judge Gardephe's thorough analysis[35] persuasive and ordered DOE to pay the full cost of tuition directly to the student's private school. *P.K. ex rel. S.K.*, 819 F. Supp. 2d at 118.

As detailed above, Judge Gardephe's comprehensive examination of the IDEA's text, history, and caselaw in *Mr. and Mrs. A.*, concluded that the type of direct, retrospective tuition sought here was an available and appropriate remedy. Judge Gardephe explained that "'broad discretion' to 'grant such relief as… is appropriate' under 20 U.S.C. § 1415(i)(2)(C)(iii) includes the power… to award retroactive direct payment of private-school tuition. This conclusion flows directly from the language of this provision, which–as the Supreme Court stated in *Burlington* and reiterated in *Forest Grove*– means what it says." *Mr. and Mrs. A. ex rel. D.A.*, 769 F. Supp. 2d at 427.  A ruling that such a remedy is unavailable would render a parent's ability to exercise their unilateral right to remove a child from an inappropriate public placement dependent upon their ability to afford tuition. This result

---

[35] Judge Gardephe's decision in *Mr. and Mrs. A., passim.*

would frustrate the intent and purpose of the IDEA and its amendments. Judge Gardephe also recognized:

> [a] contrary ruling would be entirely inconsistent with IDEA's statutory purpose, including the goal of ensuring a [free appropriate public education] to the least privileged of the disabled children in our nation. Such a ruling would also be irreconcilable with decades of case law... holding that the exercise of rights under IDEA cannot be made to depend on the financial means of a disabled child's parents.

*Id.* at 428; *see also*, *Susquenita Sch. Dist. v. Raelee S. By & Through Heidi S.*, 96 F.3d 78, 86–87 (3d Cir. 1996) (The purpose of the Act, which is to ensure that every child receives a "free and appropriate education," is not advanced by requiring parents, who have obtained a ruling that a proposed IEP is inadequate, to front the funds for continued private education). In *Sabatini v. Corning-Painted Post Area Sch. Dist.*, 78 F. Supp. 2d 138 (W.D.N.Y. 1999), after finding that the student was entitled to an order awarding prospective placement in a private facility, the court ordered the school district to directly pay the student's private residential placement without the requirement that the parents show an inability to pay. *Sabatini*, 78 F. Supp. 2d 138. Post-*Burlington* case law strongly supports the availability of a direct tuition payment remedy to protect the right of a student with disabilities to receive a FAPE.[36]

### C. Amendments to the IDEA Support Plaintiffs' Position

Subsequent amendments to IDEA have not altered this broad remedial authority. Following *Burlington*, Congress amended the IDEA to include an express remedy to reimburse parents who pay tuition at an appropriate private school. *See* 20 U.S.C. § 1412(a)(10)(C)(ii). The Supreme Court held this amendment was "elucidative rather than exhaustive", thus affirming the availability of this particular remedy, not precluding the availability of other remedies considered appropriate under IDEA's broad grant of discretion. *See Forest Grove School Dist.*, 557 U.S. 230. The Supreme Court

---

[36] The IDEA requires "appropriate" relief, and "the only possible interpretation is that the relief is to be 'appropriate' in light of the purpose of the Act". *Draper*, 518 F.3d at 1285, *citing School Committee of Town of Burlington, Mass.*, 471 U.S. 359 ([E]quitable considerations are relevant in fashioning relief', and the court enjoys 'broad discretion' in so doing. *See Florence County School Dist. Four*, 510 U.S. at 16),

noted that a narrow reading of IDEA's remedial provisions would be "at odds with the general remedial purpose underlying IDEA and the 1997 Amendments" because "[t]he express purpose of the Act is to 'ensure that all children with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs.'" *Id.* at 244 (emphasis added) (quoting § 1400(d)(1)(A)). Indeed, the court held, "[w]ithout the remedy respondent seeks, a 'child's right to a free appropriate education . . . would be less than complete.'" *Id.* at 244–45 (emphasis in original) (quoting *School Committee of Town of Burlington, Mass.*, 471 U.S. at 370). Congress' authorization of a tuition reimbursement remedy in § 1412(a)(10)(C)(ii) does not foreclose the availability of other tuition remedies for the denial of FAPE. In *Forest Grove School Dist.*, the Supreme Court rejected a comparably limiting interpretation of § 1412(a)(10)(C)(ii).[37]

In *Forest Grove School Dist.*, 557 U.S. 230, the school district argued that because the preceding provision authorizes reimbursement to parents of children with disabilities "who previously received special education and related services under the authority of a public agency," it categorically barred a parent whose child with disabilities had not previously received special education and related services under the authority of a public agency from obtaining private-school tuition reimbursement. *Id.* at 2492. The Supreme Court rejected the district's argument and held that the 1997 IDEA amendments "impose no such categorical bar." *Id.* at 2488; see also *id.* at 2496 ("IDEA authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate, regardless of whether the child previously received special education or related services through the public school."). The court conducted a detailed analysis of § 1412(a)(10)(C)(ii), concluding:

> Because that clause is phrased permissively, stating only that courts "may require" reimbursement in those circumstances, it does not foreclose reimbursement awards in other circumstances. Together with clauses (iii) and (iv), clause (ii) is best read as elaborating on the general rule that courts may order reimbursement when a school district fails to provide

---

[37] 129 S. Ct. at 2491–94.

a FAPE by listing factors that may affect a reimbursement award in the common situation in which a school district has provided a child with some special-education services and the child's parents believe those services are inadequate... The clauses of 20 U.S.C. § 1412 (a) (10) (C) are thus best read as elucidative rather than exhaustive.

*Id.* at 2493. The court further concluded the district's proposed interpretation of § 1412 (a)(10)(C)(ii) was "at odds with the general remedial purpose underlying IDEA and the 1997 Amendments" because "[w]ithout the remedy [the parent] seeks, a `child's right to a free appropriate education... would be less than complete." *Id.* at 2494–95 (quoting *School Committee of Town of Burlington, Mass.*, 471 U.S. at 370. § 1412(a)(10)(C)(ii) is not the only provision in the IDEA on which parents may rely in seeking private-school tuition payment, as this amendment did not replace the preexisting equitable powers to fashion appropriate relief granted to the courts under § 1415(i)(2)(C)(iii), which is independent of the tuition reimbursement remedy provided in § 1412(a)(10)(C)(ii). In [*Burlington* and *Carter*], the Supreme Court construed § 1415(i)(2)(C)(iii) to authorize reimbursement when a school district fails to provide a FAPE and a child's private-school placement is appropriate, without regard to the child's prior receipt of services. *Forest Grove School Dist.*, 557 U.S. 230. The Court held it would take more than Congress' failure to comment on the category of cases in which a child has not previously received special-education services for it to conclude that the amendments substantially superseded its decisions and, in large part, repealed § 1415(i)(2)(C)(iii). *Forest Grove School Dist.*, 557 U.S. 230.

   As in *Forest Grove*, the canons of statutory interpretation disfavor a finding here that Congress repealed the equitable authority described in § 1415(i)(2)(C)(iii) and *Burlington* implicitly through the permissive language of § 1412(a)(10)(C)(ii). See *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 127 S. Ct. 2518, 2532, 168 L. Ed. 2d 467 (2007) (stating that repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest.); *Branch v. Smith*, 538 U.S. 254, 273, 123 S. Ct. 1429, 155 L. Ed. 2d 407 (2003) ("An implied repeal will only be found where provisions in two statutes are in `irreconcilable conflict,' or

where the latter Act covers the whole subject of the earlier one and `is clearly intended as a substitute'" (quoting *Posadas v. Nat'l City Bank of New York*, 296 U.S. 497, 503, 56 S. Ct. 349, 80 L. Ed. 351 (1936)).

### D. The Court's Inherent Equitable Powers to Fashion a Remedy

While courts may not substitute their notions of 'sound educational policy' for those of the school authorities they review, the issue of whether a parent must prove financial inability to pay before retroactive direct payment may be ordered is a <u>question of law</u> for which the SRO's decision deserves no deference from this Court. See, *e.g., Mr. and Mrs. A. ex rel. D.A.*, 769 F. Supp. 2d at 420. Further, the IDEA explicitly authorizes a reviewing court to "grant such relief as the court determines is appropriate." § 1415(i)(2)(C)(iii).[38] IDEA was prompted by Congress' recognition that "there is an urgent and substantial need...to enhance the capacity of State and local agencies and service providers to identify, evaluate, and meet the needs of all children [with disabilities], particularly minority, low-income, inner-city, and rural children." 20 U.S.C. § 1431(a)(5). This finding animates IDEA's requirement that special-education services are to be provided "at no cost to parents", 20 U.S.C. § 1401(29), and the provisions of IDEA reflect Congress' determination that the guarantee of a FAPE should extend to all children with disabilities, regardless of their financial means. *Mr. and Mrs. A. ex rel. D.A.*, 769 F. Supp. 2d at 421, citing § 1437(b)(7) (requiring that when any state seeks federal grant money for its early childhood intervention programs, its application "shall

---

[38] *See Forest Grove School Dist.*, 557 U.S. at 239 (recognizing that § 1415 (i)(2) (C) (iii) gives courts broad authority to grant "appropriate" relief, including reimbursement for the cost of private special-education when a school district fails to provide a FAPE); *see also*, *Mr. and Mrs. A. ex rel. D.A.*, 769 F. Supp. 2d at 420; *Soria v. New York City Dep't of Educ.*, 397 F. Supp. 3d 397, 406 (S.D.N.Y. 2019), *vacated and remanded*, 831 F. App'x 16 (2d Cir. 2020); *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 869 F. Supp. 2d 320, 332 (E.D.N.Y. 2012), *aff'd*, 725 F.3d 131 (2d Cir. 2013) (When it is determined that the IEP offered was deficient and that Plaintiffs' unilateral placement was appropriate, the "district court enjoys broad discretion in considering equitable factors relevant to fashioning relief.").

provide satisfactory assurance that policies and procedures have been adopted to ensure meaningful involvement of underserved groups, including... low-income... families").[39]

The legislative history of the IDEA and its reauthorizations also reflect Congress' concern with protecting the rights of low-income children and ensuring universal access to special-education services. *Mr. and Mrs. A. ex rel. D.A.*, 769 F. Supp. 2d at 421, citing 136 Cong. Rec. S14410–02 (daily ed. Oct. 2, 1990) (statement of Sen. Kennedy) (expressing concern over the "already pervasive condition" of "mislabeling and over-referral of minority, poor, and limited-English proficient children"); 136 Cong. Rec. H9632–01 (daily ed. Oct. 15, 1990) (statement of Rep. Miller) ("The legislation before us today clarified ambiguities in current law to ensure that all children who need special services are not excluded because of definitional barriers."); 150 Cong. Rec. S11658–01 (daily ed. Nov. 19, 2004) (statement of Sen. Bingaman) (noting that IDEA was intended to address the fact that "[t]he likelihood of exclusion was significantly greater for children with disabilities living in low-income, ethnic and racial minority, or rural communities"). IDEA's overarching concern for children from low-income homes and its legislative history counsels caution in adopting an interpretation of § 1415(i)(2)(C)(iii) that would limit a private school tuition remedy to those who have the means to pay the tuition in the first instance. *Mr. and Mrs. A. ex rel. D.A.*, 769 F. Supp. 2d at 421.

Mindful of the purpose and intent of the IDEA, to place a burden on the parents of a child with disabilities to prove their inability to pay for private placement where, indisputably, their child was denied a FAPE and their unilateral placement at the private school was appropriate, would flout the statutory requirement that special-education placements are to be provided "at no cost to the parent."

---

[39] *See* § 1453(b)(8) (requiring states seeking grants for educational personnel development to "describe the steps that the State educational agency will take to ensure that poor...children are not taught at higher rates by teachers who are not highly qualified"); § 1471(a)(2)(iii) (providing for federal grants to nonprofit parent organizations only when "the parent and professional members of which are broadly representative of the population to be served, including low-income parents"); § 1481(d)(3)(C) (providing that in awarding general educational grants, the Secretary may "give priority to... projects that address the needs of... children from low-income families").

N.Y. Educ. Law § 4401(1). Indeed, direct payment would seem to be the preferred option for payment, considering that **the district, not the parent, must pay for an appropriate education** – whether from the district's schools or, when it fails, in a private school placement. It also contradicts public policy to inquire into a family's finances as a threshold for determining entitlement to public education. Such a rule "would leave parents of modest means with no options, while wealthier families pursued a reimbursement remedy." *Mr. and Mrs. A. ex rel. D.A.*, 769 F. Supp. 2d at 426.[40] In *Sabatini*, a case in which the relief requested was prospective direct payment in a private facility, the Court Ordered the district to directly pay the cost of a student's private placement without requiring the parents prove their inability to pay. *Sabatini*, 78 F. Supp. 2d 138. Allowing different forms of relief for different families depending on their level of financial stability frustrates the goals and purpose of IDEA and should not be made a precedent. As the Third Circuit mentions in *Susquenita School Dist.*, 96 F.3d 78, "[t]he IDEA was enacted to guarantee handicapped children a free and appropriate education." *Serbin v. Bora Corp.*, 96 F.3d 66, 85 (3d Cir. 1996)

Many problems exist if a means test is adopted for parents to receive direct retrospective payment. For instance, if Parents have the financial means to front the tuition costs, but doing so would leave them unable to pay for health insurance, their mortgage, etc. until they receive a judgment for reimbursement, are they required to take out a second mortgage if they can? Are they required to get a second job? It seems inequitable not to require those with little to no means to front private

---

[40] "Under Defendant's reading of the IDEA, therefore, even in a situation as the one presented here where both the school and the parent agree that the child's unique needs require placement in a private non-approved school and that there are no approved schools that would be appropriate, a destitute child would be left in an inappropriate program because the parents would not be able to front the tuition of the private placement. Given [] the fragile state of many disabled children, and their dire need for constant and consistent care, even brief periods of inappropriate schooling could lead to tremendous educational, social, emotional, and psychological deterioration. Families of greater economic means would not be faced with such a grim prospect. It simply cannot be the case that an Act designed to grant "all" disabled children access to needed services would undermine that very goal by making such access dependent upon a family's financial situation." *Mr. and Mrs. A. ex rel. D.A.*, 769 F. Supp. 2d at 426–27, *quoting*, *Connors v. Mills*, 34 F. Supp. 2d 795, 805  (N.D.N.Y. 1998).

school costs but to require families who may have *barely* have enough to get by to front the costs.[41] While parents who unilaterally place their disabled students in private school bear the financial risk of doing so, the risk is that they will not prevail in the administrative proceedings and owe the private school and related services providers payment for past services, and not that they may ultimately prevail and be unable to have their students' education funded by the district AND STILL owe the private school and providers money. Forcing parents to pay out of pocket for something the local school district is obligated to provide and have no funds for years before getting reimbursed can hardly be considered a "free" education. Thus, the SRO's decision should be modified to order the district to pay iBRAIN and A.M.'s related services providers directly without requiring Plaintiffs to prove their financial means or make payment if the first instance.

For the reasons set forth above, limited deference to SRO Krolak is warranted[42], and the equities favor direct retrospective payment to iBRAIN for the cost of tuition and to A.M.'s special transportation provider. It would be inequitable to reward DOE for its admitted failure to comply with IDEA.[43]

## **CONCLUSION**

In light of the preceding, Plaintiffs request that this Court grant Plaintiffs' Motion for Summary Judgment and issue an Order finding that: (1) Defendants denied A.M. a FAPE for the 2018–2019 SY; (2) that the parent's unilateral placement at the private school was appropriate; and (3) that the

---

[41] Imposing a financial means test in the IDEA context is simply not practical. Would the requirement for direct pay relief be a complete inability to pay? Would the parents have to show a hardhip, and how is that defined? Would parents be required to work more than one job, if they could? How would parents satisfy this burden? How intrusive would the inquiry get? Indeed, SRO Krolak noted in his opinion, "For example, there is no evidence in the hearing record regarding the parents' financial resources, such as a copy of a recent tax return or evidence regarding the parents' assets, liabilities, income, or expenses." [R 0018]. There is nothing in the IDEA or any caselaw that suggests parents who have prevailed on all three prongs of the *Burlington/Carter* Test need subject themselves to such scrutiny where the district is obligated to provide their child a FAPE.

[42] It should also be noted that IHO Kehoe awarded Plaintiffs direct, retrospective tuition payment for the 2019-2020 and 2020-2021 school years without a showing of any inability to pay, which was not appealed by DOE to the Office of State Review.

[43] *See N.R. ex rel. T.R.*, 2009 WL 874061, at *8.

equities favor full tuition reimbursement or direct payment to Plaintiffs for A.M's placement at iBRAIN during the 2018–2019 SY.

Dated:  June 24, 2022
        New York, NY

Respectfully submitted,
Brain Injury Rights Group, Ltd.
*Attorneys for Plaintiffs*

By: _____/S/_____

Rory J. Bellantoni, Esq. (RB2901)
300 East 95th Street, Suite 130
New York, NY 10128
(646) 850-5035
rory@pabilaw.org

cc:

**<u>VIA ECF</u>**

Aaron Wiener
New York City Law Department
*Attorneys for Defendant*
100 Church Street
New York, NY 10007
212-356-4362
awiener@law.nyc.gov